UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) Cause No. 1:22-CR-00119-SEB-TAB |
| MICAH MOORE, | ) ) ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by counsel, Zachary A. Myers, United States Attorney for the Southern District of Indiana, and Kelsey L. Massa, Assistant United States Attorney, hereby files this sentencing memorandum in advance of the hearing currently scheduled for September 12, 2023. For the reasons stated herein, the United States recommends this Court sentence the defendant, Micah Moore, to a sentence of 96 months of imprisonment. This is a slight upward variance from the advisory sentencing guideline range of 70 to 87 months.

I. **The Offense Conduct**

On July 18, 2022, investigators with the Indianapolis Metropolitan Police Department executed a search warrant at Micah Moore's residence in Indianapolis. In the dining room area of the residence, police recovered two Glock switch devices and three black auto sears. Auto sears convert semi-automatic rifles into fully automatic machineguns; Glock switches do the same for semiautomatic Glock handguns. A photo of one of the recovered auto sears is included below and attached herein as Exhibit 1:

1



There were two 3D printers recovered from the dining area. Post-*Miranda,* Moore admitted to making switches and auto sears using his 3D printers. Moore also admitted to selling switches, auto sears, and firearms, including multiple semiautomatic rifles. Moore stated that he would buy firearms from people "off the street" and resell them.

The recovered Glock switches appeared to be missing components that would allow them to function as intended. However, according to data extracted from Moore's cell phone, Moore was determined to learn how to make them correctly. Moore used the encrypted texting application Telegram to message another individual ("BOSS BABII"), who sent Moore detailed instructions on how to manufacture and install Glock switch devices, along with videos illustrating the process. Screenshots are included below and attached as Exhibit 2:

**From:** [redacted] BØSS BABИ

Most of it u can find on amazon, just type in PLA+ filament

6/11/2022 11:19:56 PM(UTC-4)

Source Info:
00008101-001669961E82001E_files_full-exte.zip/private/var/mobile/Containers/Shared/AppGroup/4C5D9E2B-61BE-452A-BD8D-B5CEC75C2B63/telegram-data/account-12574994748919845222/postbox/db/db_sqlite : 0x3EA51 (Size: 19423232 bytes)

**From:** [redacted] BØSS BABИ

Print em with PLA+ Or Nylon material, regular PLA can melt

6/11/2022 11:19:56 PM(UTC-4)

Source Info:
00008101-001669961E82001E_files_full-exte.zip/private/var/mobile/Containers/Shared/AppGroup/4C5D9E2B-61BE-452A-BD8D-B5CEC75C2B63/telegram-data/account-12574994748919845222/postbox/db/db_sqlite : 0x3EAF1 (Size: 19423232 bytes)

**From:** [redacted] BØSS BABИ

Keep in mind u cant put it on single stack glocks aka 43 and 43x

6/11/2022 11:20:17 PM(UTC-4)

HOW TO INSTALL YOUR SWITCH ON YOUR GLOCK

Attachments:

Size: 51594598
File name: IMG_5714.MOV
IMG_5714.MOV

6/11/2022 11:20:17 PM(UTC-4)

When asked if he had printed the switches yet, Moore responded that he could not get his 3D printer to work, and that he would have to get a new one.



Indeed, investigators recovered two 3D printers from Moore's residence. (PSR ¶ 6).

Moore admitted to police that, in addition to making and selling switches and auto sears, Moore was also selling firearms. (PSR ¶ 8). Electronic evidence corroborates this. For example, in May of 2022, Moore sent the following photos (attached herein as Exhibits 3 and 4) via Facebook to several different people, advertising he had multiple rifles for sale:



One potential customer responded and asked if the red rifle was still available; Moore (whose Facebook profile name is "Macaroni Tony") replied that he had sold it, but that Moore had a couple of Glock handguns. The customer asked for the price ("What's the ticket"), and Moore responded that he wanted to put switches on them:

```
Sent    2022-05-13 20:13:55 UTC
Body    What's the ticket on the glocks

Author  Macaroni Tony (Facebook: 100002551112770)
Sent    2022-05-13 20:14:17 UTC
Body    I'm really tryna get 15-20 and take em to the city

Author  Macaroni Tony (Facebook: 100002551112770)
Sent    2022-05-13 20:14:20 UTC
Body    Try to get like 15 I'm really tryna whole sale all of em and I'm a put
        switches on em
```

Moore's Drug Dealing Activity

During the search of Moore's residence, police recovered a knotted plastic bag containing forty blue pills from a kitchen cabinet.[1] Laboratory analysis confirmed the pills contained fentanyl and weighed a total of 4.8 grams.



Evidence from Moore's social media accounts and cell phone further shows that Moore was manufacturing and distributing counterfeit prescription pills containing fentanyl. For example, on June 25, 2022, Moore texted a customer asking, "You need sum Blues," likely referring to blue fentanyl pills.



-See attached Exhibit 8

---

[1] The above photo of the recovered pills is attached herein as Exhibit 6. The corresponding lab report is attached as Exhibit 7. Other recovered tablets and substances tested positive for methamphetamine.

On July 9, 2022, Moore sent the following photo to a drug customer via Facebook:



-See attached Exhibit 9

The blue pills in this photo are marked "ALG 265," consistent with a 30 milligram Oxycodone Hydrochloride pill.[2] But these pills were almost certainly not manufactured by a pharmaceutical company. As shown below, Moore was making them himself, and they contained the highly potent synthetic opioid, fentanyl.

On May 29, 2022, Moore texted a drug customer offering "gas percs [and] Roxies" for sale.[3] The customer responded, "I don't do fentanyl or smoke." Moore asserted that "The percs not fetty they real deal," meaning that his Percocet pills did not contain fentanyl.[4] As the conversation continued, Moore stated that his 30

---

[2] https://www.drugs.com/imprints.php?imprint=alg+265

[3] Roxicodone is an opioid analgesic containing either 15 milligrams or 30 milligrams of oxycodone hydrochloride.
https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021011s002lbl.pdf

[4] Percocet pills contain the opioid painkiller Oxycodone Hydrochloride, a Schedule II controlled substance.

7

milligram pills were "pressed," meaning counterfeit, but insisted that his 10 milligram Percocet pills were real. The full exchange is attached herein as Exhibit 13.

Moore's cell phone contained multiple videos depicting a large pill press. A screenshot from one such video is included below:



-See attached Exhibit 10

No pill press machine was recovered from Moore's residence, but the video above appears to have been taken in Moore's basement. A photo of Moore's basement taken during the execution of the search warrant shows a similar brick wall, flooring, and aluminum tray:

---

https://www.accessdata.fda.gov/drugsatfda_docs/label/2006/040330s015,040341s013,040434s003lbl.pdf



-See attached Exhibit 11

Moore received a text message on June 18, 2022, indicating that someone tested his pills and found they contained fentanyl. In response, Moore "laughed" at the message..





- See attached Exhibit 12

## II.     The Applicable Legal Standard

The advisory Guidelines range serves as "the starting point and the initial benchmark," for a Court's sentencing determination. *Gall v. United States*, 552 U.S. 38, 49 (2007). After determining the appropriate Guidelines range, the Court considers the factors set forth in 18 U.S.C. § 3553(a). *United States v. Hurt*, 574 F.3d 439, 443 (7th Cir. 2009). Those factors may demonstrate a need for a variance above or below the Guidelines range. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." U.S.S.G. § 3661.

Sentencing courts have broad discretion to consider uncharged or even acquitted conduct in fashioning a sentence as long as the conduct is established by a preponderance of the evidence. *United States v. Watts,* 519 U.S.148, 152 (1997) (per curiam); *United States v. Mays,* 593 F.3d 603, 609–10 (7th Cir.2010); *United States v. Heckel,* 570 F.3d 791, 797 (7th Cir.2009); *see* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4. "[A] judge is entitled to impose sentence based on what the defendant actually did, whether or not a particular enhancement applies." *United States v. Price*, 16 F.4th 1263, 1266 (7th Cir. 2021).

## III.    Machine Gun Conversion Devices

For decades, fully automatic machineguns were expensive, difficult to obtain, and rarely used to commit serious crimes. This has changed in recent years, thanks to small devices colloquially known as "switches" (for installation in Glock-style pistols) or "sears" (for installation in semi-automatic rifles).

An auto sear converts a semiautomatic gun into a weapon capable of emptying an entire magazine with a single pull of the trigger. Conversion devices can be installed in many types of handguns or rifles, but they are particularly common for Glock handguns. A pistol equipped with a conversion device can fire up to 1200 rounds per minute – a faster rate of fire than the standard M-4 machinegun issued to U.S. military servicemembers.[5]

Advances in 3D printer technology, combined with online global commerce and social media, have made it possible to create a deadly machine gun from the comfort of your living room. Conversion devices can be printed at home, as the defendant in this case did, or they can be ordered online for as little as $20. Installation is simple, using readily available instructional videos on platforms like YouTube and TikTok.

According to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the number of guns with switches seized nationwide increased more than five times from about 300 in 2020 to 1,500 in 2021.[6] These homemade machine guns are adding even more fuel to the fire that is American gun violence, making shootings more deadly and creating added risks for bystanders. Not only can more bullets hit a victim in a shorter amount of time, but the rapid-fire also makes the gun more difficult to

---

[5] https://www.justice.gov/usao-ndtx/pr/fort-worth-manufacturer-charged-glock-switch-case
[6] Alain Stephens and Keegan Hamilton, *The Return of the Machine Gun*, March 24, 2022, https://www.thetrace.org/2022/03/auto-sear-gun-chip-glock-switch-automatic-conversion/.

control.[7] This can result in bullets spraying across a larger area and hitting more people than just the intended target.

Shootings across the country bear out this deadly trend. In September of 2021, a man with a gun modified with a switch fired at two police officers in Houston, Texas, killing one and injuring another.[8] In April of 2022, one of the gunmen in a mass shooting in Sacramento, California, carried a gun outfitted with a switch; that shooting left six people dead and 12 people injured.[9] Also in April 2022, nine people were shot outside a McDonald's in Chicago, two fatally.[10] The gun used in that shooting was a Glock 19 outfitted with a switch and an extended magazine, which held 34 rounds of ammunition.

Indianapolis is no exception. The Indianapolis Metropolitan Police Department has noticed an increase in seizures of machine gun conversion devices over the last two years.[11]

### IV.  Application of the 3553(a) Factors

a. <u>Nature and Circumstances of the Offense and the Seriousness of the Offense</u>

---

[7] *Id.*
[8] https://www.houstonpublicmedia.org/articles/news/criminal-justice/2021/10/13/410787/hpd-cop-killer-used-illegal-switch-to-make-gun-fully-automatic/.
[9] https://fox40.com/news/sacramento-mass-shooting/gun-recovered-at-mass-shooting-scene-had-been-modified/.
[10] https://www.npr.org/2022/10/28/1131026241/chicago-handgun-violence-auto-sear-machine-gun
[11] https://www.wthr.com/article/news/crime/impd-indianapolis-increase-in-glock-switches-turing-handguns-into-machine-guns/531-2b708f11-32d0-4d5c-a56f-1d9fb6f5ea28

The nature and circumstances of this offense are extremely serious. Moore was manufacturing machine gun conversion devices, including auto sears for rifles and Glock switches for handguns, and selling them. (PSR ¶ 8). As explained above, the sole and exclusive purpose of these devices is to convert an already dangerous firearm into an extremely dangerous machinegun.

But the Sentencing Guidelines have a void when it comes to such devices. *See generally United States v. Hixson*, 2022 WL 3908595 (N.D. Illinois, August 31, 2022). The Guidelines do not include machine guns or machine gun conversion devices in the definition of "firearms." *See* U.S.S.G. § 2K2.1, Application Note 1; 18 U.S.C. § 921(a)(3). So regardless of how many machine gun conversion devices Moore possessed, there can be no corresponding increase in his offense level for any specific offense characteristics listed in 2K2.1(b). Because the range does not account for Moore's possession, sale, and manufacturing of multiple machine gun conversion devices, the United States is seeking a slight upward variance.

Moore was also selling firearms, despite his status as a convicted felon. The dangerousness of this conduct cannot be overstated. Gun violence is an epidemic, in this district and nationwide. So much of that violence is fueled by those who are themselves prohibited from possessing firearms or ammunition. A convicted felon himself, Moore was surely unconcerned about his customers' backgrounds.

Finally, Moore was manufacturing and selling counterfeit prescription pills containing fentanyl. As this Court is surely well aware, in recent years overdose deaths have skyrocketed both in this District and nationwide. Fentanyl pills, like the

13

defendants', are responsible for many of these fatal overdoses. Of the fentanyl-laced fake prescription pills analyzed by the Drug Enforcement Administration's laboratory in 2022, six out of ten pills contained a potentially lethal dose of fentanyl.[12] In Marion County alone in 2022, more than 800 residents died from fatal overdoses; the Chief Deputy Coroner attributed this in large part "to the influx of fentanyl in the drug supply that is flooding our nation."[13]

The advisory Sentencing Guidelines' range does not fully capture Moore's conduct in this case. The range does not account for Moore's uncharged drug activity, nor does it fully reflect the seriousness of his crimes involving machine gun conversion devices and firearms dealing. In the midst of two deadly crises – gun violence and widespread opioid addiction - Moore saw an opportunity to make money.

A slight upward variance is therefore entirely appropriate under 18 U.S.C. § 3553(a).

b. <u>History and Characteristics of the Defendant</u>

Moore's history and characteristics also weigh in favor of a significant sentence. Moore has been a convicted felon since the age of 18, when he was convicted of felony theft. (PSR ¶ 25). Two counts of felony robbery were dismissed in connection with this disposition. (Id.) He received a suspended sentence, which afforded him the

---

[12] https://www.dea.gov/onepill

[13] https://www.wfyi.org/news/articles/proposed-800k-opioid-response-program-would-support- treatment-prevention-and-other-services-in-marion-county#:~:text=More%20than%20800%20Marion%20County,our%20nation%2C%E2%80%9D%20Mc Ginty%20said

opportunity to serve his sentence in the community, rather than in custody. (Id.) Moore fared poorly – he failed to pay program fees, failed to obtain his GED, failed to complete court-ordered community service hours, and acquired new criminal charges. (Id.) He was eventually revoked and sentenced to two years of executed time.

Moore's new criminal charges were for robbery. (PSR ¶ 27). Moore was convicted of felony robbery and sentenced to four years of community corrections in September of 2012; again, he was revoked after violating the terms of his supervision and sentenced to executed time. (*Id.*) According to Indiana Department of Corrections' online database, Moore's projected release date was in August of 2015. In October of 2015, Moore was arrested again, after police recovered a firearm, marijuana, and hydrocodone pills from his person during a traffic stop (PSR ¶ 28). He was convicted of that offense in August of 2016. (*Id.*) Moore was sentenced to 10 years of imprisonment, with four years executed, six years suspended, and one year of probation. (*Id.*) His probation was later revoked, and he was sentenced to community corrections home detention. (*Id.*)

Moore was discharged from probation in February of 2022. He was arrested in this matter on July 18, 2022.

An individual with the defendant's criminal history should never be in close proximity to firearms, ammunition, or machine gun conversion devices. This Court should sentence him accordingly.

   c. <u>Need for the Sentence to Provide Just Punishment and Promote Respect for the Law</u>

As previously discussed, this is a serious offense. The danger and harm that machine gun conversion devices cause is well-documented. *See* Section III, *supra*. That the defendant was also selling firearms and manufacturing and distributing fentanyl pills further justifies a lengthy sentence. A sentence of 96 months would provide just punishment. Such a sentence accounts for all of Moore's criminal conduct.

Throughout his repeated contacts with the criminal justice system, Moore has evinced a total lack of respect for the law. He habitually commits new crimes while under supervision or violates other terms of his release. Even while incarcerated, Moore failed to comply with the rules. He was involved in 10 disciplinary hearings while in custody at the Indiana Department of Correction between 2013 and 2018. (PSR ¶ 30). At the time of this offense, Moore was just a few months removed from being discharged from probation.

This slight upward variance would therefore also promote respect for the law.

   d. <u>The Need for Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant</u>

As his multiple probation violations, revocations, and recidivism shows, Moore has not been deterred by his prior sentences of incarceration or court-ordered supervision. He simply reoffends.

Moore has repeatedly proven that he is either unwilling or unable to live as a law-abiding citizen. His prior convictions have involved violence, theft, drugs, and

guns. More recently, he has chosen to make a living by exploiting those suffering from drug addiction and by dealing in dangerous weapons. A lengthy sentence – one slightly above the advisory guidelines range – is therefore necessary to protect the public.

e. <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

Any disparity which may arise between Moore's sentence and other defendants would be warranted and would reflect the individual circumstances of his offense.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests the Court impose a sentence of 96 months. Such a sentence is sufficient, but not greater than necessary, to meet the goals of sentencing under 18 U.S.C. § 3553(a).

Respectfully Submitted,

Zachary A. Myers
United States Attorney

By:   /s/ *Kelsey L. Massa*
Kelsey L. Massa
Assistant United States Attorney
Kelsey.massa@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on **September 5, 2023,** the foregoing Government's Sentencing Memorandum was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By:  /s/ *Kelsey L. Massa*

       Kelsey L. Massa
       Assistant United States Attorney
       Kelsey.massa@usdoj.gov